GEORDIE DUCKLER
(OR Bar No. 873780)
ANIMAL LAW PRACTICE
831 SW Hume Street
Portland, OR 97219
(503) 546-8052
geordied@animallawpractice.com

JESSICA L. BLOME
(Cal. Bar No. 314898, pro hac vice application pending)
JENNIFER RAE LOVKO
(Cal. Bar No. 208855, pro hac vice application pending)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com
rlovko@greenfirelaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
### PENDLETON DIVISION

| | |
|---|---|
| OREGON WILD HORSE ORGANIZATION, a nonprofit organization, CENTRAL OREGON WILD HORSE COALITION, a non-profit organization, and WESTERN WATERSHEDS PROJECT, a non-profit organization, | CASE NO. _____ |
| Plaintiffs, | **PLAINTIFFS' COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND REQUEST FOR JUDICAL REVIEW** |
| v. | |
| UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and BARRY BUSHUE, Oregon State Director of the Bureau of Land Management, | |
| Defendants. | |

1.    The Kiger and Riddle Mountain Herd Management Areas, or "HMAs," are located in Harney County, Oregon. These HMAs have been designated as the Kiger Mustang Area of Critical Environmental Concern (ACEC). On July 22, 2024, the United States Department of Interior, Bureau of Land Management (BLM) issued a final environmental assessment (FEA), DOI-BLM-ORWA-B050-2020-0004-EA, and Finding of No Significant Impact (FONSI) for the adoption of the Kiger and Riddle Mountain HMAs Population Management Plan (Gather Plan). The Gather Plan provides for the removal of wild horses from the HMAs over a ten-year period, requiring the use of intensive fertility control management, either independently or in conjunction with each gather.

2.    BLM has announced in its current gather and fertility control schedule that a drive trap will be used to gather 440 horses in the Kiger HMA from October 17, 2024, through October 30, 2024, with 20 of the horses to be returned to the HMA after being administered GonaCon (an immunocontraceptive vaccine). A drive trap gather is set to occur in the Riddle Mountain HMA from August 15, 2025, through August 30, 2025, with 245 horses to be gathered. Twenty of these gathered horses will be returned to the HMA after being administered GonaCon. In both gathers, the unreturned horses will be shipped to off-site facilities for adoption.

3.    In managing wild horses and burros on public lands, BLM has mandatory obligations under the Wild Free-Roaming Horses and Burros Act (Wild Horse Act), 16 U.S.C. § 1331, et seq., the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., and the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 et seq. Defendants have violated these obligations by (1) failing to base the Gather Plan on achieving and maintaining a thriving natural ecological balance (TNEB), (2) failing to implement land use plans (LUPs) and the herd management area plan (HMAP) for the Kiger and Riddle Mountain HMAs, (3) failing to conform the Gather Plan to LUPs and the HMAP for the Kiger and Riddle Mountain HMAs, (4) failing to meet the immediacy requirement of the Wild Horse Act, (5) failing to give special management attention to the Kiger Mustang ACEC, (6) failing to take a "hard look" at the

environmental consequences of the Gather Plan, and (7) failing to allow the public a meaningful opportunity to participate in review of the Gather Plan.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the subject matter of this action pursuant to 5 U.S.C. § 706, 28 U.S.C § 1331, and 28 U.S.C. § 1361.

5.      Venue is proper in this district court pursuant to 28. U.S.C. § 1391. The BLM has sufficient contacts to subject it to personal jurisdiction in this district.

## THE PARTIES

6.      Plaintiff OREGON WILD HORSE ORGANIZATION (OWHO) is a nonprofit advocacy organization dedicated to protecting wild native equines on public lands. On behalf of its members and supporters, OWHO participates in education, legislation, and litigation concerning wild native equines and their habitats. Its principal place of business is at P.O. Box 115, Drain, Oregon 97435. The gathering and removal of wild horses in the Kiger and Riddle Mountain HMAs due to the challenged actions of BLM will adversely affect the substantial recreational, aesthetic, and conservational interests of OWHO and its volunteers, members, and supporters.

7.      Plaintiff CENTRAL OREGON WILD HORSE COALITION (COWHC) is a nonprofit organization that focuses on the management of and relationships with wild Mustangs on public lands. Its principal place of business is P.O. Box 1242, Prineville, Oregon 97754. The gathering and removal of wild horses in the Kiger and Riddle Mountain HMAs due to the challenged actions of BLM will adversely affect the substantial recreational, aesthetic, and conservational interests of COWHC and its volunteers, members, and supporters.

8.      Plaintiffs OWHO and COWHC (collectively, Wild Horse Advocates) and their members, supporters, and volunteers have a long-standing interest in the management of public lands. Wild Horse Advocates' members, supporters, and volunteers visit the Kiger and Riddle Mountain HMAs for professional pursuits, as well as for recreational pursuits that include

photography, hiking, and observing wildlife. Wild Horse Advocates' members, supporters, and volunteers gain aesthetic enjoyment from observing, attempting to observe, hearing, seeing evidence of, and studying wild horses. The opportunity to possibly view wild horses, or signs of horses, in these areas is of significant interest and value to Wild Horse Advocates' members, supporters, and volunteers and increases their use and enjoyment of Oregon's public lands. Wild Horse Advocates' members, supporters, and volunteers have engaged in these activities in the past and have specific plans to do so again in the future.

9.     Wild Horse Advocates' members, supporters, and volunteers are adversely impacted by the gathering and removal of wild horses from the Kiger and Riddle Mountain HMAs. Wild Horse Advocates' members, supporters, and volunteers also have an interest in the health and humane treatment of animals.

10.     Wild Horse Advocates, as well as members, supporters, and volunteers, are dedicated to ensuring the long-term survival of the wild, free-roaming horses throughout the contiguous United States, and specifically in Oregon, and to ensuring that Defendants comply with all applicable state and federal laws related to the survival and humane treatment of wild horses in Oregon. In furtherance of these interests, Wild Horse Advocates' members, supporters, and volunteers have worked, and continue to work, to protect and advocate for wild horses in Oregon and throughout the United States.

11.     The interests of Wild Horse Advocates' members, supporters, and volunteers have been, and will continue to be, injured by Defendants' improper and inhumane gather and removal of wild horses in the Kiger and Riddle Mountain HMAs. The interests of Wild Horse Advocates' members, supporters, and volunteers have been, and will continue to be, injured by Defendants' failure to comply with their obligations under the Wild Horse Act, NEPA, and FLPMA.

12.     The injunctive relief requested provides the only remedy that can redress the injuries of Wild Horse Advocates, including of their members, supporters, and volunteers. The relief requested by Plaintiffs, if granted, would require Defendants to comply with the requirements of the Wild Horse Act, NEPA, FLPMA, APA, and Mandamus and Venue Act before

gathering and removing wild, free-roaming horses from either the Kiger or the Riddle Mountain HMAs. The relief requested by Plaintiffs, if granted, would reduce the number of wild, free-roaming horses needlessly injured, killed, made infertile, or removed by Defendants.

13.     Plaintiff WESTERN WATERSHEDS PROJECT (WWP) is a non-profit environmental conservation group that works to improve public lands management throughout the western United States. WWP's principal place of business is at P.O. Box 1770, Hailey, Idaho 83333. It maintains a field office at P.O. Box 1855. Sisters, Oregon 97759. BLM's decision at issue herein will affect the substantial recreational, aesthetic, and conservation interests of WWP's staff, members and supporters who care about the proper management of watersheds and wildlife on public lands. WWP, its staff, volunteers, members and supporters are deeply concerned that the BLM routinely and systematically overlooks the detrimental effects of private livestock grazing and, in the case of the Kiger and Riddle Gather Plan, have inaccurately and without sufficient analysis scapegoated horses. WWP's interests in this decision include the proper and unbiased administration of public lands and a full and fair environmental analysis of landscape health.

14.     Defendant BARRY BUSHUE is Oregon State Director of BLM, and is charged by federal statute with managing, administering, and protecting the wild horses and burros in the State of Oregon, including the Kiger HMA and Riddle Mountain HMA, pursuant to the Wild Horse Act.

15.     Defendant BLM is charged by federal statute to manage administer and protect the wild horses and burros in the State of Oregon, including in the Kiger HMA and Riddle Mountain HMA, pursuant to the Wild Horse Act.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

16.     On August 17, 2024, WWP and OWHO timely appealed Defendants' July 22, 2024, approval of the FEA to the United States Interior Board of Land Appeals and petitioned for an order staying that decision.

17.     To date, the IBLA has not rendered a decision on Plaintiffs' appeal or petition to stay.

18.     Plaintiffs have exhausted administrative remedies.

1    **GENERAL ALLEGATIONS OF FACTS**

2    **A. LEGAL FRAMEWORK**

3    19.    As relevant to this case, BLM's obligations to wild horses on public land are

4    established through FLPMA, Wild Horse Act, and NEPA.

5    **FLPMA**

6    20.    FLPMA was adopted to ensure that public lands are managed in a manner that

7    protects the quality of scientific, scenic, historical, ecological, environmental, air and

     atmospheric, water resource, archeological, recreational, and wildlife values. 43 U.S.C. § 1701.

8    21.    The Secretary of the Interior must manage the public lands under principles of

9    multiple use and sustained yield, in accordance with land use plans … *except that where a tract*

10   *of such public land has been dedicated to specific uses according to any other provisions of law*

11   *it shall be managed in accordance with such law*. *Id.* at § 1732(a) (emphasis added).

12   22.    Multiple use "means the management of the public lands and their various

13   resource values so that they are utilized in the combination that will best meet the present and

14   future needs of the American people; making the most judicious use of the land for some or all of

15   these resources or related services over areas large enough to provide sufficient latitude for

16   periodic adjustments in use to conform to changing needs and conditions; the use of some land

17   for less than all of the resources; a combination of balanced and diverse resource uses that takes

18   into account the long-term needs of future generations for renewable and nonrenewable

19   resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife

20   and fish, and natural scenic, scientific and historical values; and harmonious and coordinated

21   management of the various resources without permanent impairment of the productivity of the

22   land and the quality of the  environment with consideration being given to the relative values of

23   the resources and not necessarily to the combination of uses that will give the greatest economic

     return or the greatest unit output." *Id.* at § 1702(c).

24   23.    The Secretary also "shall prepare and maintain on a continuing basis an inventory

25   of all public lands and their resource and other values (including, but not limited to, outdoor

26

recreation and scenic values), *giving priority to areas of critical environmental concern*. This inventory shall be kept *current* so as to reflect changes in conditions and to identify new and emerging resource and other values." *Id.* at § 1711(a) (emphasis added).

24.     Priority also is given to areas of critical concern (ACECs) for the development and revision of land use plans. *Id.* at § 1712(c).

25.     ACECs are "areas within the public lands where *special management attention* is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards." *Id.* at § 1702(a) (emphasis added); *see also* 43 CFR § 1601.0-5.

26.     FLPMA also addresses allotment management plans (AMPs) for domestic livestock grazing, providing that AMPs "shall be tailored to the specific range condition of the area to be covered by such plan and shall be reviewed on a periodic basis." *Id.* at § 1752(d). An AMP "(1) prescribes the manner in, and extent to, which livestock operations will be conducted in order to meet the multiple-use, sustained-yield, economic and other needs and objectives as determined for the lands by the Secretary concerned; and (2) describes the type, location, ownership, and general specifications for the range improvements to be installed and maintained on the lands to meet the livestock grazing and other objectives of land management; and (3) contains such other provisions relating to livestock grazing and other objectives found by the Secretary concerned to be consistent with the provisions of this Act and other applicable law." *Id.* at § 1702(k).

### Wild & Free Roaming Horses and Burros Act

27.     Finding that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West," and that "they contribute to the diversity of life forms within the Nation and enrich the lives of the American people," Congress enacted the Wild Horse Act to ensure that "wild-free roaming horses and burros shall be protected from capture, branding, harassment, [and] death," and will "be considered in the area where presently found, as

1    an integral part of the natural system of the public lands." 16 U.S.C. § 1331.

2       28.    The land sustaining an existing herd of wild horses is to be "devoted principally

3    but not necessarily exclusively to their welfare in keeping with the multiple-use management

4    concept for the public lands." 16 U.S.C. § 1332(c).

5       29.    The Wild Horse Act directs the Secretary of the Interior to "manage wild free-

6    roaming horses and burros as components of the public lands ... in a manner that is designed to

7    achieve and maintain a thriving natural ecological balance on the public land." 16 U.S.C. § 1331.

8       30.    "If necessary to provide habitat for wild horses or burros, to implement herd

9    management actions, or to protect wild horses or burros from disease, harassment or injury, the

10   authorized officer may close appropriate areas of the public lands to grazing use by all or a

     particular kind of livestock." 43 C.F.R. § 4710.5(a).

11      31.    BLM's regulations require that the Secretary of the Interior establish herd

12   management areas (HMAs) for the maintenance of wild horse and burro herds. 43 C.F.R. §

13   4710.3-1. In delineating each herd management area, BLM must consider the appropriate

14   management level for the herd, the habitat requirements of the animals, the relationships with

15   other uses of the public and adjacent private lands, and the constraints contained in § 4710.4,

16   which limits management of wild horses and burros to "the minimum level necessary to attain

17   the objectives identified in approved land use plans *and* herd management area plans." 43 C.F.R.

18   § 4710.4 (emphasis added).

19      32.    Land use plans (LUPs) and herd management area plans (HMAPs) are not

20   equivalent documents. 43 CFR § 4710.4; *Leigh v. Raby*, No. 3:22-cv-00034-MMD-CLB, 2024

21   U.S. Dist. LEXIS 57734, at *12 (D. Nev. Mar. 28, 2024).

22      33.    When BLM finds that an overpopulation of horses exists in an HMA *and* that

23   action is necessary to remove excess animals, the Wild Horse Act authorizes the agency to act

24   immediately in removing all excess animals so as to restore a TNEB to the range. 16 U.S.C. §

     1333.

25      34.    To demonstrate the existence of excess animals, BLM relies upon data showing

26

that AML has been exceeded. The Wild Horse Act does not define AML, but BLM Handbook H-4700-1, Wild Horses and Burros Management Handbook, provides "AML is expressed as a population range with an upper and lower limit. The AML upper limit is the number of [wild horses] which results in a TNEB and avoids a deterioration of the range. The AML lower limit is normally set at a number that allows the population to grow to the upper limit over a 4-5 year period, without any interim gathers to remove excess [wild horses]."

35.    A finding that the number of wild horses exceeds AML does not in and of itself mandate that BLM remove wild horses from public lands. *See Wyoming v. United States DOI*, No. 14-CV-0248, 2015 U.S. Dist. LEXIS 189415, at *12 (D. Wyo. Apr. 21, 2015) ("while AMLs can function as a necessary and informative 'trigger' to alert BLM to a population imbalance, this Court does not agree AMLs alone are sufficient to require BLM initiate the removal process"), affirmed by *Wyoming v. United States DOI*, 839 F.3d 938, 944 (10th Cir. 2016); BLM Handbook H-4700-1 (stating that "[j]ustifying a removal based on nothing more than the established AML is not acceptable"). Instead, after overpopulation has been established, BLM still must make a determination that removal is necessary. *See Wyoming*, 839 F.3d at 944.

36.    To make a determination that removal is necessary, BLM must show that rangeland health assessments show degradation is happening or is imminent so as to not be achieving TNEB. *See Wyoming*, 2015 U.S. Dist. LEXIS at *13 (removal is necessary when required to "achieve and maintain a thriving natural ecological balance on the public lands"); BLM Handbook H-4700-1 (BLM makes a determination regarding the necessity of removal based upon analysis of "current information including grazing utilization and distribution, trend in range ecological condition, actual use, climate (weather) data, [and] current population inventory").

**National Environmental Policy Act**

37.    The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., governs decisions by BLM to gather horses and burros. NEPA requires federal agencies to take a "hard look" at environmental consequences before carrying out federal actions. *Marsh v. Or.*

1    *Nat. Res. Council*, 490 U.S. 360, 373–74 (1989).

2    38.    NEPA serves the dual purpose of, first, informing agency decisionmakers of the

3    significant environmental effects of proposed major federal actions and, second, ensuring that

4    relevant information is made available to the public so that it "may also play a role in both the

5    decision-making process and the implementation of that decision." *Robertson v. Methow Valley*

6    *Citizens Council*, 490 U.S. 332, 349 (1989).

7    39.    To meet these goals, NEPA requires a comprehensive Environmental Impact

     Statement ("EIS") for "major Federal actions significantly affecting the quality of the human

8    environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.3.

9    40.    To determine whether a proposed action will have significant effects, an agency

10   may prepare an Environmental Assessment (EA). 40 C.F.R. § 1501.54. An EA is a "concise

11   public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining

12   whether to prepare an [EIS].'" *Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, 757 (2004)

13   (quoting 40 C.F.R. § 1508.9(a)).

14   41.    If in its EA the agency finds that the proposed action will not significantly affect

15   the human environment, it may issue a finding of no significant impact (FONSI) in lieu of an

16   EIS. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) (citing

17   40 C.F.R. § 1508.9(a)(1)); *see also* 40 C.F.R. § 1501.6(e).

18   42.    A FONSI "briefly present[s] the reasons why an action … will not have a

19   significant effect on the human environment and for which an [EIS] therefore will not be

20   prepared." 40 C.F.R. § 1508.1(1).

21   **B.  The Gather Plan for the Kiger and Riddle Mountain HMAs**

22   43.    BLM states that the Gather Plan "is designed to manage wild horse populations

     with available intensive fertility control treatments, over a ten-year period that would begin at the

23   time of the first gather, and with wild horse removals, which would most likely include one to

24   three excess determinations and associated gather operations during the ten-year timeframe

25   within the Kiger and Riddle Mountain HMAs." *Id.*, p.14.

26

44.     BLM states that the initial gather is intended to remove horses to the low end of the current AMLs for the Kiger and Riddle Mountain HMAs.

45.     The Gather Plan provides for the removal of horses through the use of helicopters and trap sites. *Id.*, pp.12-13. The Plan also provides for fertility control measures; however, BLM does not identify what specific measures it considers allowable under the Plan. *Id.*, p.14.

46.     BLM's ultimate goal for the Kiger HMA is to have a population consisting of 25 fertile studs and 26 mares treated with a fertility control vaccine and for the Riddle Mountain HMA to have a population consisting of 16 fertile studs and 17 mares treated with a fertility control vaccine. *Id.*, p.14. After this has occurred, BLM will make a decision regarding the frequency of new mare treatments and mare re-treatments with an immunocontraceptive vaccine. *Id.*

47.     The goal of the fertility control vaccines is to maintain an average annual growth rate of 2-5%. *Id.*, p.16.

48.     Treatment of mares with an immunocontraceptive vaccine would be done by hand during gathers and by darting on years in between gather activities.

49.     BLM states that genetic monitoring will be conducted following gathers. "If the results of genetic monitoring indicate that levels of genetic diversity (as measured in terms of observed heterozygosity) become unacceptably low, the BLM would consider introduction of wild horses that have appropriate phenotypes and are from HMAs in similar environments, to maintain the projected genetic diversity." *Id.*, p.12. Fertility control monitoring also would be conducted. *Id.*

50.     BLM acknowledges that the Wild Horse Act requires management of the Kiger and Riddle Mountain HMAs in a manner designed to achieve and maintain a TNEB. FEA, p.1. In describing the purpose of the Gather Plan, the agency states a need to "[r]estore a TNEB and protect rangeland resources from deterioration associated with overpopulation." *Id.*, p.4.

51.     The agency states that a TNEB is accomplished, "in part, by establishing … Appropriate Management Levels (AMLs)." *Id.* "Maintaining the population within AML under a

1   population plan is consistent with BLM's mandate to manage for healthy rangeland resources, a

2   thriving natural and ecological balance (TNEB), and multiple uses of BLM-managed public

3   lands." *Id.*

4       52.     The AML for the Kiger HMA is 51-82 wild horses; the AML for the Riddle

5   Mountain HMA is 33-56 wild horses. *Id.*, p.2. The agency acknowledged that "AMLs are

6   established to provide for the maximum number of wild horses that results in a thriving natural

7   ecological balance (TNEB) and avoids a deterioration of the range." *Id.*, p.3.

8       53.     BLM states the AMLs for the Kiger and Riddle Mountain HMAs were originally

9   set at 50-80 for the Kiger HMA and 30-50 for the Riddle Mountain HMA. *Id.*, p.3. In actuality,

10  the 1977 Drewsey Management Framework Plan established the original AML at 50-80 for the

    Kiger HMA and 80-120 for the Riddle Mountain HMA.

11      54.     BLM states the current AML range was established "through a land use plan

12  amendment in 1986 as a result of a land exchange with the State of Oregon." *Id.*, p.3. The agency

13  has not identified the specific land use plan amendment by name, but a land use plan amendment

14  was issued at this time for the Andrews and Drewsey Management Framework Plans. That

15  amendment specifically stated that the land exchange would not affect wild horse population

16  levels, water supply, or their free-roaming nature.

17      55.     Prior to the 1990s, reviews of BLM's setting of AMLs consistently reported that

18  AMLs were not based on thorough assessments of range conditions and did not consider carrying

19  capacity of the range. *See* Using Science to Improve the BLM Wild Horse and Burro Program: A

20  Way Forward (NRC, 2013), pp. 224-25.

21      56.     The current AMLs, whenever they were first established, were "reaffirmed…in

22  the Three Rivers [Range Management Plan] RMP (1992). … Because these HMAs lie partially

23  (Kiger) and entirely (Riddle Mountain) in the Steens Mountain Cooperative Management and

    Protection Area (CMPA), the Steens Mountain CMPA RMP/ROD (August 2005) reaffirmed 672

24  AUMs or an AML of 33-56 for Riddle Mountain HMA and 984 AUMs or an AML of 51-82 for

25  Kiger HMA. These AMLs were established with public participation following an in-depth

26

analysis of resource monitoring studies." *Id.*

57.    The FEA is identified as providing a "site-specific analysis of the potential impacts that could result with the implementation of the proposed action or alternatives." FEA, p.1. In fact, the FEA focused solely on the number of horses currently in the HMAs without analysis of current, site-specific land health standards or other factors related to a determination that it is necessary to remove wild horses.

58.    "Since 1992, both HMAs have been surveyed nine times and gathered four times to remove excess wild horses and maintain the population within AML." *Id.*, p.3. The draft EA, which was issued on April 25, 2024, determined the current wild horse population based upon data collected from a June 2017 aerial survey and an assumed annual population growth of 20%. Draft EA, pp.2-3. Subsequently, after the timeframe for public comment had passed, another aerial survey was conducted and reported in the FEA. FEA, p.3. This survey identified 241 adults and 43 foals in the Riddle Mountain HMA and 448 adults and 60 foals in the Kiger HMA. FEA, Appendix I. The survey reported different error percentages for each of the HMAs without explanation.

59.    For the 2015 gathers, BLM stated "[d]ue to the small herd size, popularity and adoptability, PZP contraceptives and returning/releasing geldings into the wild are not considered for these herds." 2015 Kiger and Riddle Mountain Wild Horse Gather at https://www.blm.gov/programs/wild-horse-and-burro/herd-management/gathers-and-removals/oregon/2015-kiger-riddle-wild-horse-gather.

60.    In looking at environmental impacts, BLM stated that "[t]he four essential habitat components (water, forage, cover, and space) for wild horses 'must be present within the HMAs in sufficient amounts to sustain healthy wild horse and burro populations and healthy rangelands over the longterm.'" FEA, p.26. Horses and cattle can be in direct competition for these habitat components. *Id.,* p.27.

61.    "Livestock grazing management is adjusted annually based on forage and water conditions/availability within each allotment; adjustments are made to timing and duration of use

and numbers of livestock. This is designed to achieve standards for rangeland health and conform to guidelines for livestock grazing management." *Id.*, p.20. The Kiger and Riddle Mountain HMAs are comprised of three allotments: the Smyth-Kiger, Happy Valley, and Burnt Flat allotments. *Id.*, p.25.

62.     An Animal Unit Month (AUM) is the amount of forage to sustain one cow/calf pair or one horse for a month. The allotments for the Kiger and Riddle Mountain HMAs allow the use of 8,268 Animal Unit Months (AUMs) of forage for livestock. FEA, p.43. The allocated AUMs for wild horses in the Kiger and Riddle Mountain HMAs is 1,056 AUMs. *Id.*, p.3.

63.     The number of authorized livestock in these allotments totals 1,202 cattle. *Id.*, p.44. (In comparison, BLM's May 2024 survey indicated under 800 horses currently reside in the Kiger and Riddle Mountain HMAs.)

64.     Based solely on "the current estimated wild horse populations in the HMAs," BLM concludes that horse-livestock competition is "more likely to occur[, and] there is concern regarding the potential for degradation of rangeland resources in typical home ranges surrounding the limited reliable water sources." *Id.*, p.28. However, BLM's FEA does not actually contain any monitoring data or observations that demonstrate competition currently is occurring, that the horses in the HMAs are degrading rangeland resources, or that removal of horses will address any potential degradation.

65.     Instead, BLM states that "there are consistent, concentrated, and repeated higher levels of use in areas where horses and cattle overlap. Upland trend sites show sites are losing deep-rooted perennial bunch grasses that in turn could be replaced with annual grasses thus reducing available perennial forage." *Id.*, p.46. BLM does not differentiate between cattle and horse impact, does not include any actual monitoring data in the FEA, does not provide any conclusions regarding the severity of impact related to horse and cattle overlap, and does not demonstrate that removal of horses will address any potential impact that may be occurring now or in the imminent future.

66.     BLM also states that "rangeland analysis platform (RAP) data from 2015 to 2023

for the Kiger HMA shows for cover that perennial and annual grass and forb cover are decreasing as bare ground and shrub cover are increasing. For Annual Biomass annual grasses are decreasing due to the annual grass treatments that have occurred recently in this area. Perennial grass decreasing during drought years and slight increase on non-drought years. RAP data from 2015-2023 for the Riddle Mountain HMA shows for cover that annual forbs and grasses are static trend and perennial forbs and grasses are increasing. Bare ground is increasing, which could lead to the invasion of annual species. Shrub cover appears to be a static trend." *Id.*, p.46. BLM's FEA does not include any actual RAP data, does not demonstrate that any decrease in perennial grass, annual grass, or forb cover is being caused by horses (versus cattle, grass treatments, or drought), does not provide any conclusions regarding the severity of impact, and does not demonstrate that removal of horses will address any potential impact that may be occurring now or in the imminent future.

67.     Further, BLM states that utilization studies in the HMAs are only showing localized moderate to heavy use areas around water sources and wild horse home ranges. *Id.*, p.55. This conclusion does not seem to indicate that a TNEB is being threatened. BLM also did not identify which utilization studies it relied upon, did not provide any data from these studies to indicate that such localized impact was caused by horses, and did not demonstrate that removal of horses will address any potential impact that may be occurring now or in the imminent future.

68.     BLM notes that invasive plants and noxious weeds, such as cheatgrass and thistle, can increase wildfire risk and impact ecosystems. According to BLM, the last intensive survey of the Kiger and Riddle Mountain HMAs was conducted in 2013, and it revealed that invasive plants and noxious weeds existed throughout the Kiger HMA, including near roads and the Rock Creek Reservoir, and in the Riddle Mountain HMA predominately along roads and previously used trap areas. *Id.*, pp.58-60. Without providing any evidence, BLM concludes that the wild horse population in the HMAs will increase the rate of spread and dominance in areas infested with invasive plants and noxious weeks. BLM did not include any data or identify site-specific

studies, did not address the impact of horses versus cattle or other wildlife, and did not demonstrate that removal of horses will address any potential impact that may be occurring now or in the imminent future.

69.    BLM addressed soil and biological crusts in the FEA, noting that both horses and livestock can impact soil, increase potential erosion, and damage biological soil crusts. *Id.*, pp.62-63. Nonetheless, BLM concludes that wild horses pose a greater threat because their use in the HMAs cannot be actively managed in comparison to use by livestock. *Id.*, p.64.

70.    The FEA never establishes that a TNEB is not being achieved or that any degradation of the rangeland, be it localized or otherwise, has either been caused by the wild horses or can be cured by removal of wild horses.

71.    Appendix E of the FEA notes that genetic sampling and analysis were conducted in 2004, 2009, 2011, and 2015. FEA, Appendix E.

72.    In 2004, genetic analysis of horses in the Riddle Mountain HMA indicated a significant reduction in genetic variation from 1993 to 2003. This reduction was assumed to be related to the herd's low population size.

73.    Analysis associated with horses gathered in 2009 from the Kiger and Riddle Mountain HMAs remarked on genetic variants, finding allelic diversity to be less than average for herds in both HMAs.

74.    The 2011 analysis for the Kiger and Riddle Mountain HMAs reported that heterozygosity levels had declined considerably. It was assumed that these reductions were related to the herd sizes having seen a recent decline, and the author of the analysis stated "[p]opulations that consist of less than 100 individuals are at high risk of loss of variability and this can occur rapidly at low population numbers."

75.    The 2015 analysis for the Kiger and Riddle Mountain HMAs showed a high percentage of genetic variation was at risk. And, for the Riddle Mountain HMA, variability levels are low enough to be concerned. The author of the analysis reported that from 2003 through 2015, the data showed a trend for heterozygosity decreasing over time.

76.    BLM states that the Gather Plan is "in conformance with the objectives and management actions" of the Three Rivers RMP/ROD, the Steens Mountain CMPA RMP/ROD, as amended by the 2015 Oregon Greater Sage-Grouse Approved RMP Amendment/ROD, and the 1996 HMAP for the Riddle Mountain and Kiger HMAs. *Id.*, p.5. As addressed below, this is not accurate.

**C.  Obligation to Base the Gather Plan on Appropriate AMLs and Achieving/Maintaining TNEB**

77.    When BLM finds that an overpopulation of horses exists in an HMA *and* that action is necessary to remove excess animals, the Wild Horse Act authorizes the agency to act immediately in removing all excess animals so as to preserve or maintain a TNEB to the range. 16 U.S.C. § 1333.

78.    In addressing whether overpopulation exists, the Gather Plan relies solely on data showing that AML is being exceeded. AMLs are established through site-specific data that addresses the optimum population levels necessary to achieve and maintain a TNEB. 15 U.S.C. § 1332(b)(2); *Dahl v. Clark*, 600 F. Supp. 585, 592-95 (D. Nev. 1984). Where AML does not reflect this, BLM may not rely upon AML in its removal decisions. *See Dahl*, 600 F. Supp. at 592-93 (BLM may not establish AML without evidence, analysis or studies; establishing AML to avoid the need for any AUMs reduction is in violation of the Wild Horse Act); *Animal Protection Institute of America*, 109 IBLA 112 (1989) (BLM cannot base removal decisions on AMLs established "purely for administrative reasons" rather than on studies establishing "the optimum number which results in a thriving natural ecological balance and avoids a deterioration of the range").

79.    Plaintiffs challenge the original decision that set the current AML range, which BLM identifies as "a land use plan amendment in 1986 as a result of a land exchange with the State of Oregon." FEA, p.3. This 1986 AML adjustment was not based on evidence, analysis, or studies indicating the optimum population levels associated with a TNEB.

80.    Plaintiff also challenges the Three Rivers RMP and Steen Mountain CMPA RMP,

which BLM contends "reaffirmed" AML. Neither of these documents examined AML based on evidence, analysis, or studies indicating the optimum population levels associated with a TNEB. *See also Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1122 (D. Mont. 2016) (discussing the difference between reaffirming and recalculating AML).

81.    While BLM does not have a duty to recalculate AML with each gather, where it knows that AML has not been established through evidence, analysis, or studies indicating the optimum population levels associated with a TNEB, reliance on AML to establish the existence of overpopulation is arbitrary and capricious.

82.    Even if BLM could rely on the current AML, the agency failed to show that it was necessary to immediately remove animals. *See* 16 U.S.C. § 1333. Necessity is established by BLM demonstrating that the agency cannot achieve or maintain a TNEB without removal of excess horses. *See W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1282 (D. Utah 2017).

83.    BLM cannot rely solely on the number of horses in the Kiger and Riddle Mountain HMAs to conclude that removal of excess horses is necessary. *See Wyoming*, 2015 U.S. Dist. LEXIS at *13; Wyoming, 839 F.3d at 944; BLM Handbook H-4700-1. Instead, BLM needs to show that land health standards cannot be achieved without the removal. *See* BLM Handbook H-4700-1; BLM Manual M-4720.

84.    In BLM's removal handbook, the agency recognizes that "[i]n making a determination that excess wild horses and burros are present and require removal, the authorized officer shall analyze current information for the following elements: grazing utilization and distribution; trend in range ecological condition; actual use; climate (weather) data; current population inventory; wild horses and burros located outside the HMA, or in herd areas (HAs) not designated for their long-term maintenance; and other factors such as the results of land health assessments which demonstrate removal is needed to restore or maintain the range (refer to Title 43 United States Code (USC) Section 1333 of the Public Law (PL) 92-195, The Wild Free-Roaming Horses and Burros Act, and Animal Protection Institute of America, 109 IBLA

1 112, 120 (1989)).” BLM Manual M-4720.

2   85. Here, The FEA notes that “[o]n most years, both Kiger and Riddle Mountain

3 HMAs have adequate water in the form of perennial streams and springs…Due to the elevation

4 and location on the north end of Steens Mountain, abundant forage is generally available for

5 horses.” BLM provides no evidence that the rangeland in the Kiger and Riddle Mountain HMAs

6 is actually being impacted by wild horses in such a manner as to necessitate removal of horses to

7 preserve or maintain the range. The FEA contains no data regarding grazing utilization and

8 distribution, trends in range ecological condition, actual use, climate, or other land health

 assessments.

9

10   86. Rather than conduct a site-specific analysis addressing rangeland health, BLM’s

 FEA generally talks about the *potential* impacts that horses *may* have on the health of public

11 lands. Horses (as well as cattle and other wildlife) always *may* pose *potential* impacts, but a

12 gather plan can only go forward where such impact is based upon site-specific information

13 demonstrating a need for immediate removal in the at-issue HMAs. 16 U.S.C. § 1333.

14 **D.  Obligation to Implement LUPs and HMAP**

15   87. Where agencies make a commitment pursuant to a record of decision, they are

16 legally bound by the commitment. *See Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1123

17 (D. Mont. 2016); § 40 CFR 1505.3. A record of decision can be used to compel compliance with

18 or execution of such commitments. *See id.*

19   88. Plaintiff challenges BLM’s failure to implement the Three Rivers RMP, Steens

20 Mountain CMPA RMP, and HMAP for the Kiger and Riddle Mountain HMAs, all of which

 were adopted with a ROD.

21

22   89. All RMPs must be monitored on a continual basis with a formal evaluation done

 at periodic intervals. 43 CFR § 1610.4-9.

23

24   90. The Three Rivers RMP was adopted through creation of an environmental impact

 statement (EIS) and record of decision (ROD) in 1992. Formal evaluations are to be conducted

25 about every 5 years with annual updates thereafter. Plaintiffs are unaware of any formal

26

1    evaluation occurring for the Three Rivers RMP after 1992.

2        91.    The Three Rivers RMP states that BLM shall continue to allocate 984 AUMs for

3    horses in the Kiger HMA and 672 AUMs for horses in the Riddle Mountain HMA.

4    Implementation recognizes that excess horses will need to be removed, which action requires

5    annual herd population inventories. BLM, however, does not conduct annual herd population

6    inventories in either the Kiger or Riddle Mountain HMAs.

7        92.    The RMP addresses population adjustments through gathers, as well as

8    adjustments to AML. For gathers, the number of horses removed should be "in accordance with

     the results of monitoring studies and allotment evaluations, where such adjustments are needed

9    in order to achieve and maintain objectives for [TNEB]." Adjustments to AML are to be "based

10   on the analysis of trend in range condition, utilization, actual use and other factors which provide

11   for the protection of the public range from deterioration." To achieve this, the monitoring needs

12   include annual collection of utilization, actual use, and climate reports; long and short-term trend

13   in range condition studies conducted every 3-5 years; wild horse and burro use area mapping and

14   reporting. Prior to any change in AML, allotment evaluations also are to be prepared. BLM,

15   however, has failed to implement these objectives, and has not collected the requisite monitoring

16   data or conducted the requisite evaluations for gathers or AML adjustments.

17       93.    The RMP also contains a number of goals, implementation procedures, and

18   monitoring needs to maintain, restore or enhance the diversity of plant communities and plant

19   species. This focus on vegetation recognizes the role of grazing management practices to the

     health of native vegetation conditions. BLM has failed to implement identified procedures and

20   monitoring.

21       94.    The HMAP for the Kiger and Riddle Mountain HMAs was adopted through

22   creation of an EIS and ROD in 1996. Formal evaluation of the HMAP was to occur ten years

23   after its initiation. BLM has not conducted any formal evaluation.

24       95.    The Steens Mountain CMPA RMP was adopted through creation of an EIS and

25   ROD in 2005. Formal evaluation of the CMPA RMP is to occur about every 5 years. Plaintiffs

26

are unaware of any formal evaluation occurring for the Steens Mountain CMPA RMP after 2005.

96.     The CMPA RMP states that as part of desired rangeland conditions: "Rangeland vegetation and water sources support viable, healthy herds of wild horses through time. Individual herds have diverse age structures, good conformation, and are quality animals exhibiting characteristics unique to each herd. Wild horse numbers are in balance with the rangelands that support them. Improvements in grass/shrubland steppe and riparian areas increase the health of the herd."

97.     The wild horse objectives of the CMPA RMP include maintaining/adjusting AMLs and yearlong forage allocations for each HMA; maintaining a TNEB within HMAs; maintaining/improving year-round water sources to sustain wild horse herds; maintaining herd viability, genetic diversity, and the genetic and physical characteristics that distinguish individual herds.

98.     Management direction includes that "initiation of gathering or other methods of population control will be based on census data, herd health, rangeland health, productivity (as determined by rangeland monitoring studies), climatic conditions, and occurrence of catastrophic events such as wildland fire and drought. … [Further, m]anagement includes maintaining water sources critical to wild horses, developing additional water sources to improve animal distribution and provide more stable water sources during periods of drought, and seeking cooperative management agreements for access to or acquiring legal access to private water sources critical to wild horses. A diverse age structure and sex ratios ranging from 40 to 50 percent female and 50 to 60 percent male will be maintained. Wild horses returned to the HMA after a gather will possess representative characteristics of the herd's conformation, size, color, and unique markings. New animals from other HMAs will be introduced when needed to increase diversity of the genome or maintain herd characteristics."

99.     The CMPA RMP addresses monitoring needs. For wild horses, monitoring includes "animal counts, determination of animal locations and seasonal movements/use areas, annual reproduction rates, herd age structure, sex ratios, physical traits (size, color, weight,

unique markings), and establishment and reassessment of herd baseline genomes. Resource monitoring includes collection of climatic data, use supervision, and actual use data. Additional vegetation condition and trend data shall be gathered during monitoring for grazing management, riparian vegetation, and rangelands. Monitoring provides information necessary to determine need for and timing of gatherings, which animals to remove, and whether or not to maintain or adjust AMLs."

100.    BLM has failed to implement the management directions and monitoring required by the CMPA RMP for wild horses.

101.    The CMPA RMP also contains objectives, management directions, and monitoring requirements for livestock grazing, noting that "[t]he intent of grazing management is to maintain sufficient herbaceous material to provide adequate soil and watershed protection, provide forage and cover for wildlife and wild horses, and meet other resource objectives."

102.    "Grazing management monitoring is designed to measure effects of grazing animals (e.g., domestic livestock, wild horses, and wildlife) on a variety of resources and uses including vegetation, riparian habitat, water quality, T&E species, wildlife habitat, wilderness, recreation, and wild horse and burro habitat. Monitoring provides information necessary to change management strategies defined in EAs, allotment evaluations, AMPs, and possibly the RMP itself. Monitoring provides the feedback loop to evaluate management decisions and implementation, and provides the evaluation necessary to change management strategies to best manage resources." Monitoring includes utilization studies, the collection of actual use data, and more.

103.    BLM has failed to implement the management directions and monitoring required by the CMPA RMP for livestock grazing.

104.    The failure of BLM to implement the Three Rivers RMP, Steens Mountain CMPA RMP, and HMAP for the Kiger and Riddle Mountain HMAs has injured Plaintiffs as the FEA for the Gather Plan must conform with land use plans and HMAPs. 43 C.F.R. § 4710.4; 43 U.S.C. § 1732(a). Where these plans and HMAPs are not implemented, the purpose of the Wild

1    Horse Act and FLPMA cannot be met.

2    **E.  Obligation to Conform the Gather Plan to LUPs and HMAP**

3    105.    Gather plans must conform to and address the objectives in LUPs and HMAPs. 43

4    C.F.R. § 4710.4; 43 U.S.C. § 1732(a). BLM has failed to conform the Gather Plan to the Three

5    Rivers RMP, Steens Mountain CMPA RMP, and HMAP for the Kiger and Riddle Mountain

6    HMAs because (a) these LUPs and HMAP have not been fully implemented, as addressed above,

     and (b) BLM has not demonstrated the plans' objectives are being or will be met.

7    106.    The FEA/FONSI decision to remove horses is not based on annual herd

8    population estimates, utilization studies, actual use data, and climate reports, as dictated by the

9    Three Rivers RMP.

10    107.    The FEA/FONSI decision to remove horses is not based on herd health, rangeland

11    health, productivity (as determined by rangeland monitoring studies), climatic conditions, and

12    occurrence of catastrophic events such as wildland fire and drought, as required by the Steens

13    Mountain CMPA RMP. To the extent the FEA/FONSI mentions drought, BLM does not address

14    the CMPA RMP's direction that management include "maintaining water sources critical to wild

15    horses, developing additional water sources to improve animal distribution and provide more

16    stable water sources during periods of drought, and seeking cooperative management agreements

17    for access to or acquiring legal access to private water sources critical to wild horses." BLM does

18    not rely on current monitoring data to "measure health and viability of wild horse and burro

19    populations, and measure effects of their grazing on resources and uses."

20    108.    The FEA/FONSI decision to remove horses is not based on census data,

21    utilization studies, or rangeland trend studies, as envisioned by the HMAP for the Kiger and

     Riddle Mountain HMAs.

22    **F.  Obligation to Immediately Remove Excess Horses**

23    109.    Where BLM has determined that an excess population exists that necessitates

24    removal, the Wild Horse Act mandates that removal occur immediately. *See* 16 U.S.C. §

25    1333(b)(2); *Western Rangeland Conservation Ass'n v. Zinke*, 265 F.Supp.3d 1267, 1286-88 (D.

26

Utah 2017) (finding a six-to-ten-year phased-in gather plan violated the Wild Horse Act's immediacy requirement); *Friends of Animals v. Culver*, 610 F. Supp. 3d 157, 170 (D.D.C. 2022) (finding a ten year gather plan exceeded BLM's statutory authority pursuant to the Wild Horse Act's immediacy requirement); *Friends of Animals v. U.S. Bureau of Land Management*, Civil Action No. 2018-2029 (D.D.C. 2024) (maintenance gather plans are disallowed; to conduct a gather after BLM has already achieved AML and after the herd has once again grown to the point that "an overpopulation exists," constitutes a determination that a new "overpopulation exists" and that a new "action is necessary to remove [the] excess animals).

110.     The immediacy requirement of the Wild Horse Act was adopted by amendment in 1978. *Am. Horse Prot. Asso. v. Watt*, 694 F.2d 1310, 1315-19 (D.C.C. 1982). In stating that excess horses "shall" be removed "immediately," the word "immediately" is synonymous with "expeditiously." *Id.* at 1316. 42. The Wild Horse Act's immediacy requirement means that "BLM may only delay necessary removal actions insofar as delay is necessary to plan and execute the actions safely and effectively." *Western Rangeland Conservation Ass'n*, 265 F.Supp.3d at 1288. The "pace and timing" of gather operations is not left entirely to BLM's discretion. *Id.* at 1284. A phased-in approach "eschews immediate removal to within AML in favor of longer-term management techniques…that will eventually result in a population size within AML." *Id.* at 1286. As such, it violates the immediacy requirement of the Wild Horse Act. *Id.*

111.     Here, BLM stated that removal of horses in the Kiger and Riddle Mountain HMAs is necessary to preserve and maintain a TNEB, triggering the immediacy requirement of the Wild Horse Act. Yet, it treats the Gather Plan as a maintenance plan that can be used for ten years to allow BLM unfettered discretion to remove horses whenever it wants. Either this indicates that there is no necessity to remove, or if necessity were shown, then BLM's Gather Plan violated the Wild Horse Act's immediacy requirement. Not only does the plan impermissibly allow for removal over ten years, but even within the first year, BLM is delaying removal of horses in the Riddle Mountain HMA until late-2025.

**G. Obligation to Give Special Management Attention to the Kiger Mustang ACEC**

112.    In 1992, the Kiger and Riddle HMAs were designated as "the Kiger Mustang ACEC [Area of Critical Environmental Concern] for unique characteristics of wild horses." Federal Register, Vol. 57, No. 202, Page 47671. The Gather Plan violates the FLPMA and NEPA as BLM has failed to give special management attention to these HMAs based upon their designation as an ACEC. *See* 43 U.S.C. §§ 1702(a); 1711(a).

113.    BLM has failed to conduct and maintain current monitoring data as required by the FLPMA; BLM has failed to properly address the needs of the ACEC as compared to other multi-use resources.

114.    The FEA/FONSI does acknowledge that the HMAs are part of the Kiger Mustang ACEC, which serves to protect the important historic and cultural value associated with the herds' Spanish Mustang characteristics. FEA, p.2. However, the Gather Plan does not adequately address how the removal of horses over a ten-year period of time will impact these important historic and cultural values. As further addressed below, the FEA/EA did not take a "hard look" at the impact of these gathers on genetic variability and the ability of the herds to survive. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373–74 (1989).

**H. Obligation to Take a "Hard Look" at Environmental Impacts**

115.    NEPA requires federal agencies to take a "hard look" at environmental consequences before carrying out federal actions. *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373–74 (1989).

116.    The touchstone of the Court's inquiry under NEPA is whether the agency "took a hard look at information relevant to the decision," that is, whether the agency "did a careful job at fact gathering and otherwise supporting its position." *N.M. ex rel. Richardson v. BLM*, 565 F.3d 683, 704 (10th Cir. 2009).

117.    BLM failed to take a hard look at environmental consequences. This failure includes but is not limited to the fact that BLM predetermined the result of the EA, did not take a hard look at TNEB, did not take a hard look at the ability of the herds to survive if the Gather

Plan is enacted, did not take a hard look at climate, did not properly consider alterations to livestock grazing, and did not take a hard look at alternatives to helicopter use in gathers.

### A. Predetermination

118.    During the January 2024 Steens Mountain Advisory Council Meeting, Jeff Rose (BLM Burns District Manager) announced that an EA would be prepared for the Kiger and Riddle Mountain HMAs, and that as soon as Congress passed the budget, a gather would be added to the schedule. In actuality, gathers for the Kiger and Riddle Mountain HMAs had already been put on BLM's gather schedule in December of 2023 – long before the Draft EA was produced and made public.

119.    After the Draft EA was made public, but before the FEA/FONSI was issued, BLM announced at a public meeting the future dates for gather operations in the Kiger and Riddle Mountain HMAs.

120.    The Draft EA and FEA contain boilerplate language from other EAs conducted by BLM.

121.    Where an agency has predetermined the outcome, the requirements of NEPA are not fulfilled. *See Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000) (agency predetermination is improper as it shows the environmental analysis was "a subterfuge designed to rationalize a decision already made"); *Forest Guardians v. United States Fish & Wildlife Serv.*, 611 F.3d 692 (10th Cir. 2010) (predetermination of NEPA analysis indicates agency "failed to take a hard look at the environmental consequences of its actions due to its bias in favor of that outcome, and therefore, has acted arbitrarily and capriciously").

122.    Here, instead of taking a "hard look" in its environmental assessment, the adopted 10-year plan was a predetermined outcome.

### B. TNEB

123.    BLM not only failed to demonstrate that the health of the range in the Kiger and Riddle Mountain HMAs is being jeopardized by horses, but it also cherrypicked through the scientific literature to support its implication that horses are to blame for potential range

1   degradation. Had BLM taken a hard look at the issue, the agency would have to concede that

2   removal of horses, without addressing impacts associated with cattle and other animals, is

3   unlikely to address potential rangeland degradation for the purposes of maintaining TNEB.

4       **C. Survival of the Herds**

5       124.    BLM failed to take a hard look at the impact of the Gather Plan on the unique

6   Mustang characteristics (phenotype and genotype) of the herds. This FEA/FONSI gather plan,

7   which is designed to get the HMAs to low end AML while at the same time using fertility

8   control, will not protect the unique genetics recognized by the HMAs' designation as an ACEC.

9   Past genetic testing demonstrates a disturbing trend of decreasing genetic variability in the herds,

10   and the maintenance of populations below 100 horses in each HMA indicates that the Gather

11   Plan may pose a substantial impact on the viability of the herds' continued existence. Further, the

12   Gather Plan does not address the impact on skewing sex ratios; the Gather Plan discounts the

13   impact to the social behavior of the herds.

14       125.    In looking at genetic variability, BLM's baseline is from samples taken in 2015.

15   No current genetic analysis has been conducted. However, even the 2015 samples indicated that

16   genetic variability was of concern.

17       126.    Dr. Gus Cothran, the geneticist used by BLM in the past to analyze the Kiger and

18   Riddle Mountain HMAs, has recommended a range of 150 to 200 breeding animals for animal

19   herds to maintain genetic viability.

20       127.    Craig Downer, a well-respected ecologist, has commented that the level of genetic

21   heterogeneity (genetic variation) is far from what would assure long-term viability/survival in the

22   Kiger and Riddle Mountain HMAs. He further noted that "[t]heir assigned numbers are not

23   genetically viable and are a long way from what the IUCN SSC Equid Specialist Group in their

24   1992 action plan for saving the equid species of the world recommends: a breeding population of

25   2,500 healthy interbreeding individual equids in order to assure a given herd's long-term survival

26   in their natural, "wild" habitat (Duncan, P. 1992. Zebras, Asses, and Horses: An Action Plan for

the Conservation of Wild Equids. IUCN Species Survival Commission, Equid Specialist Group.

Gland, Switzerland: International Union for Conservation of Nature). This same commission recommends 500 interbreeding individuals for a population that is tightly managed."

128.     As regards fertility control measures, BLM does not commit itself to any particular method, but its gather schedule indicates an intention to administer GonaCon for the purposes of inducing non-permanent infertility. In the FEA, BLM acknowledges that this vaccine can cause females to become permanently infertile. Indeed, one of the authors (Dan Baker) cited by BLM has reported that 19 of 24 mares (or 79%) treated with GonaCon had not returned to fertility 11 years after their initial dose and 7 years after their booster. *See* "Horse Talk," 5/28/2023, Dr. Dan Baker and Ginger Fedak at https://youtu.be/kdLHvgVm Iuw?si= ofMPhsD372oFeMl9.

129.     No studies of Gonacon have examined the social or behavioral impacts of utilizing Gonacon.

130.     Studies of Gonacon demonstrate that it has negative health effects on mares.

131.     BLM cannot justify the use of GonaCon based on current research as there are no studies that show the vaccine's use is safe or would allow sufficient fertility to allow the herds to survive. When administered through darting, BLM also cannot show that GonaCon has a higher efficacy than PZB.

132.     Without acknowledging the negative impacts of the Gather Plan, BLM nevertheless attempts to mitigate such impacts by stating that genetic testing and sex ratio monitoring will occur after gathers are conducted. However, by the time that such testing and monitoring occurs, the damage will likely be irreversible.

### D.  Climate

133.     All federal agencies are required to look at how their final decisions impact climate per Executive Orders 13990 & 14008. Secretarial Order (SO) 3399 provides that BLM must consider greenhouse gas emissions and climate change impacts. BLM ignored these orders in its analysis.

134.     BLM must compare the impacts of cattle and horses on the climate crisis based

upon current land health assessments specific to the Kiger and Riddle Mountain HMAs. The impact of cattle grazing on climate change is well-known. Horses, as nonruminants, contribute only a negligible amount of GHGs. Cattle negatively impact vegetation and soil, disperse exotics, and create metabolic and non-metabolic waste products. *See e.g.,* Kauffman, John & Beschta, Robert & Lacy, Peter & Liverman, Marc. (2022). Livestock Use on Public Lands in the Western USA Exacerbates Climate Change: Implications for Climate Change Mitigation and Adaptation. Environmental Management. 69. 10.1007/s00267-022-01633-8. "Through time, these effects on native rangelands affect fire regimes, increase erosion, compact soils affecting ecosystem hydrology, and alter competitive relationships between plant species. These actions decrease the net ecosystem productivity (NEP) such that the rangelands shift from carbon sinks to net sources of greenhouse gasses." *Id.*

### E. Alternatives

135.    BLM failed to take a hard look by omitting consideration of viable alternatives.

136.    BLM addressed an alternative that would close the HMAs to all livestock use, but it did not consider an alternative that would simply reduce cattle grazing in areas where rangeland health might be impacted, with such a reduction either being temporary or permanent. The Wild Horse Act provides that a grazing reduction should be considered if necessary to provide for horses. *See* 43 C.F.R. § 4710.5(a). Here, where BLM cannot distinguish between the impacts caused by horses versus cattle, this alternative should have been considered on its own or in tandem with other alternatives.

137.    BLM failed to look at alternatives related to the use of various fertility control methods. For example, BLM should have considered the use of PZP only.

138.    BLM failed to look at alternatives that would have conducted gathers without the use of helicopters.

139.    As regards gather operations, the Wild Horse Act provides that excess horses must be "humanely captured and removed." 16 U.S.C § 1333(b)(2)(B) & (C). "The Secretary shall cause such number of additional excess wild free-roaming horses and burros to be

humanely captured and removed for private maintenance and care for which he determines an adoption demand exists by qualified individuals, and for which he determines he can assure humane treatment and care (including proper transportation, feeding, and handling)." *Id.*

140.    The regulatory provisions of the Wild Horse Act also prohibit any person from (1) maliciously or negligently injuring or harassing a wild horse or (2) treating a wild horse inhumanely. *See* 43 C.F.R. § 4770.1.

141.    "[H]umane treatment" is defined as "handling compatible with animal husbandry practices accepted in the veterinary community, without causing unnecessary stress or suffering to a wild horse or burro." 43 C.F.R. § 4700.0-5(e). "Inhumane treatment" is defined as "any intentional or negligent action or failure to act that causes stress, injury, or undue suffering to a wild horse or burro and is not compatible with animal husbandry practices accepted in the veterinary community." 43 C.F.R. § 4700.0-5(f).

142.    Malicious treatment occurs through intentional acts that demonstrates a deliberate disregard for the well-being of wild horses. *See Mountain States Legal Found. v. Hodel*, 799 F.2d 1423, 1425 (10th Cir. 1986). "Such acts include, but are not limited to, unauthorized chasing, pursuing, herding, roping, or attempting to gather or catch wild free-roaming horses and burros." *Id.; see also* 1984 43 C.F.R. § 4700.0-5(k); 51 F.R. 7410.

143.    Oregon defines animal abuse in the first degree as occurring when any person intentionally, knowingly, or recklessly causes serious physical injury or death to an animal. *See* ORS 167.320.

144.    In public comment, BLM was provided with affidavits from the veterinary community members that demonstrate helicopter gathers are inhumane.

145.    When BLM gathers horses with helicopters, the agency knows that horses will be seriously injured or die. The agency knows that helicopter gathers result in stress, injury, or undue suffering to wild horses and is not compatible with animal husbandry practices accepted in the veterinary community.

146.    The Wild Horse Act does not grant BLM a privilege to seriously injure or kill

horses during gather operations..

**I.   Obligation to Provide the Public a Meaningful Opportunity to Participate**

147.    The ability of the public to meaningfully participate in NEPA review is essential. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

148.    BLM has violated NEPA by failing to provide the public any data it relied upon to determine that horses need to be removed from the Kiger and Riddle Mountain HMAs. BLM also did not provide the public with access to almost 200 documents referenced within the Draft EA, despite being asked to make these public.

149.    BLM has never provided the public with the methodology used in their past genetic sample analyses for the Kiger and Riddle Mountain HMAs, precluding the public from commenting on the analyses' conclusions.

150.    BLM failed to consider and respond to the public regarding numerous scientific and academic reports and data that demonstrate the Gather Plan threatens the very survival of the Kiger and Riddle Mountain HMAs.

151.    BLM's environmental assessment was based on the use of fertility control measures, but as BLM did not identify which fertility control measures might be used, the public could not meaningfully address all potential impacts.

**FIRST CAUSE OF ACTION**
**FLPMA; APA 5 U.S.C. § 706(1)-(2)**

152.    Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

153.    Plaintiffs challenge the original decision that set the current AML range, which BLM identifies as "a land use plan amendment in 1986 as a result of a land exchange with the State of Oregon." FEA, p.3. This 1986 AML adjustment was not based on evidence, analysis, or studies indicating the optimum population levels associated with a TNEB.

154.    Plaintiff also challenges the Three Rivers RMP and Steen Mountain CMPA RMP, which BLM contends "reaffirmed" AML. Neither of these documents actually examined AML

based on evidence, analysis, or studies indicating the optimum population levels associated with a TNEB.

155.    BLM's establishment and reaffirming of the current AML range without analyzing the optimum population levels for horses associated with a TNEB was arbitrary and capricious, an abuse of discretion, contrary to the law, and without observance of procedure required by law.

156.    BLM's management of the Kiger and Riddle Mountain HMAs is occurring without the agency preparing and maintaining a continuing inventory and without acknowledging the priority to be given these HMAs as a designated ACEC. *See* 43 U.S.C. § 1711(a). Such failure constitutes agency action unlawfully withheld or unreasonably delayed.

157.    Defendants' actions have injured Plaintiffs in the manner described in this Complaint.

158.    The Administrative Procedure Act gives this Court authority to compel agency action unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1).

159.    The Administrative Procedure Act gives this Court authority to hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

160.    The Administrative Procedure Act gives this Court authority to hold unlawful and set aside agency action found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

**SECOND CAUSE OF ACTION**
**NEPA; APA 5 U.S.C. § 706(1)**

161.    Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

162.    BLM has failed to implement provisions in the Three Rivers RMP, Steen Mountain CMPA RMP, and HMAP for the Kiger and Riddle Mountain HMAs. This failure is in violation of NEPA and caselaw, and BLM's failure to implement these plans constitutes agency action unlawfully withheld or unreasonably delayed.

163.    Defendants' actions have injured Plaintiffs in the manner described in this Complaint.

164.    The Administrative Procedure Act gives this court authority to compel agency action unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1).

**THIRD CAUSE OF ACTION**
**FLPMA; Wild Horse Act; APA 5 U.S.C. § 706(2)**

165.    Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

166.    The FLPMA and Wild Horse Act both provide that BLM should have conformed the Gather Plan to the Three Rivers RMP, Steens Mountain CMPA RMP, and HMAP for the Kiger and Riddle Mountain HMAs. BLM did not do this because (a) these LUPs and HMAP have not been fully implemented, and (b) BLM has not demonstrated the plans' objectives are being or will be met.

167.    BLM's approval of the Gather Plan, without being properly conformed to the Three Rivers RMP, Steens Mountain CMPA RMP, and HMAP for the Kiger and Riddle Mountain HMAs, was arbitrary and capricious, an abuse of discretion, contrary to the law, and without observance of procedure required by law.

168.    Defendants' actions have injured Plaintiffs in the manner described in this Complaint.

169.    The Administrative Procedure Act gives this Court authority to hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

170.    The Administrative Procedure Act gives this Court authority to hold unlawful and set aside agency action found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

**FOURTH CAUSE OF ACTION**
**Wild Horse Act; APA 5 U.S.C. § 706(2)**

171.    Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

172.    BLM's approval of the Gather Plan violates the immediacy requirement of the Wild Horse Act.

173.    BLM's approval of the Gather Plan was based upon AMLs that the agency knew or reasonably should have known were not based on the optimum horse population for the Kiger and Riddle Mountain HMAs for the purposes of preserving TNEB. As such, BLM violated the Wild Horse Act's requirement that the agency demonstrate excess horses exist in the HMAs.

174.    BLM approved the Gather Plan without demonstrating that it is necessary to remove horses in the Kiger and Riddle Mountain HMAs.

175.    BLM's approval of the Gather Plan, in violation of the Wild Horse Act, was arbitrary and capricious, an abuse of discretion, contrary to the law, and without observance of procedure required by law.

176.    Defendants' actions have injured Plaintiffs in the manner described in this Complaint.

177.    The Administrative Procedure Act gives this court authority to hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

178.    The Administrative Procedure Act gives this Court authority to hold unlawful and set aside agency action found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

**FIFTH CAUSE OF ACTION**
**NEPA; APA 5 U.S.C. § 706(2)**

179.    Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

180.    BLM violated NEPA when it failed to analyze every significant aspect of the

environmental impacts of removing wild horses from the Kiger and Riddle Mountain HMAs as alleged herein, including by (a) failing to give special management attention to the Kiger Mustang ACEC and failing to protect the unique characteristics of the horses in the Kiger and Riddle Mountain HMAs; (b) predetermining the result of the EA; (c) failing to take a hard look at TNEB; (d) failing to take a hard look at and provide for the ability of the herd to survive if the Gather Plan is implemented; (e) failing to take a hard look at climate; (f) failing to consider alternatives to livestock grazing; (g) failing to consider the use of PZP only; (h) failing to take a hard look at alternatives to the use of helicopters during gathers.

181.    BLM violated NEPA by failing to adhere to its requirement of providing the public with a meaningful opportunity to participate in the environmental review of the Gather Plan and its alternatives.

182.    BLM's decision to adopt the FEA/FONSI was arbitrary and capricious, contrary to the law, and without observance of procedure required by law.

183.    Defendants' actions have injured Plaintiffs in the manner described in this Complaint.

184.    The Administrative Procedure Act gives this court authority to hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

185.    The Administrative Procedure Act gives this Court authority to hold unlawful and set aside agency action found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## SIXTH CAUSE OF ACTION
### Writ of Mandamus

186.    Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

187.    The FEA/FONSI has been and will continue to be implemented in a manner that violates the FLPMA, Wild Horse Act, and NEPA. Defendants have violated their duties to base

the Gather Plan on appropriate AMLs and achieving/maintaining TNEB, to implement LUPs and HMAP, to conform the Gather Plan to LUPs and HMAP, to immediately remove excess horses after determining excess horses exist and removal is necessary, to give special management consideration to the Kiger Mustang ACEC, and to take a hard look at every significant aspect of the environmental impacts of removing wild horses from the Kiger and Riddle Mountain HMAs.

188.    The Mandamus and Venue Act, 28 U.S.C. § 1361, vests district courts with original jurisdiction over any action in the nature of mandamus to compel a federal officer or agency to perform a duty owed to plaintiffs.

189.    Defendants' actions have injured Plaintiffs in the manner described in this Complaint.

190.    Plaintiffs seek a writ of prohibition preventing Defendants from gathering wild horses under the FEA/FONSI until BLM implements the provisions of the LUPs and HMAP and recalculates AMLs

## PRAYER FOR RELIEF

THEREFORE, Plaintiffs respectfully requests that this Court:

a)    Issue a writ of prohibition preventing Defendants from gathering wild horses under the FEA/FONSI until Defendants implements the provisions of the LUPs and HMAP, re-calculate AMLs for the Kiger and Riddle Mountain HMAs, and fully complies with NEPA's requirements.

b)    Issue an order and injunction compelling Defendants to cease implementation of the FEA/FONSI for the Kiger and Riddle Mountain HMAs until Defendants have fully complied with the Wild Horse Act, NEPA, FLPMA, and APA.

c)    Vacate and set aside the FEA/FONSI;

d)    Issue an order compelling Defendants to re-calculate AMLs for the Kiger and Riddle Mountain HMAs prior to approving or conducting any gather operations;

e)    Issue an order compelling Defendants to implement the provisions of the LUPs and HMAP;

f)   Maintain jurisdiction over this action until Defendants are in compliance with the
Wild Free-Roaming Horses and Burros Act, National Environmental Policy Act,
Administrative Procedure Act, First Amendment, and every order of this Court;

g)   Award Plaintiffs attorney fees and costs pursuant to and 28 U.S.C. § 2412; and

h)   Grant such additional and further relief to which Plaintiffs may be entitled.

DATED: October 1, 2024,                    Respectfully Submitted,


/s/ Geordie Duckler
GEORDIE DUCKLER
(OR Bar No. 873780)
ANIMAL LAW PRACTICE
831 SW Hume Street
Portland, OR 97219
(503) 546-8052
geordied@animallawpractice.com


/s/ Jessica L. Blome
Jessica L. Blome
(Cal. Bar No. 314898,
pro hac vice application pending)
Jennifer Rae Lovko
(Cal. Bar No. 208855,
pro hac vice application pending)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com

Attorneys for Plaintiffs